Thank you, Your Honor. Good morning. My name is Andrew Klubach, and I would like to reserve five minutes for rebuttal, if I may. All right. Your clock shows you the full time. We'll do our best, but watch your time. Understood. Your Honor's Rule 23b-3 precludes class certification when individual issues predominate over common ones. And from the very outset of this rule, as reflected in the notes of the Advisory Committee, it was recognized that fraud cases are, quote, unsuited to class treatment when there is material variation in either the representations made or in the kinds or degrees of reliance. If that standard is to be taken remotely seriously, this class could not possibly be certified. The two named plaintiffs here seek to represent a nationwide class of millions of advertisers who placed hundreds of millions of ads on Meta over the past decade. But plaintiffs cannot prove their case with common proof because there's drastic variation amongst the representations made and whether various class members relied upon them, creating at least five distinct insurmountable problems. First, advertisers viewed estimates that ranged from de minimis inflation to allegedly 50% or greater. Second, the hundreds of millions of ads were purchased only the advertiser saw on the very same screen as the alleged inflated estimate. Another estimate in much larger font called Estimated Daily Results, which Meta said that's the metric you should look at for setting your budget, and that varied widely depending on each advertiser's individual budget and performance. Third, each estimate was accompanied by substantive disclosures explaining how potential reach worked, when to use it, what it included, and that materially changed over time. Fourth, the second, or at least the minute after an advertiser purchased their very first ad, Meta immediately gave them a host of other information in real time about the actual results of their ad. So potential reach really doesn't matter anymore. Even Estimated Daily Results don't matter as much because those advertisers are getting in real time actual results. And then finally, fifth, the class varies widely through all kinds of different advertisers. From Fortune 500 companies that spend tens of millions or more on ads, may have used ad agencies to other advertisers who worked specifically with a dedicated Meta personnel or person who worked with them closely and talked them through how to budget and prepare their ads, down to sole proprietors who may have been trying out the platform for the very first time before they ever got any results. And there's everything in between. There's just no way a jury could assess with common evidence whether each of these millions of advertisers, let alone any particular advertiser over time, many of these advertisers advertised throughout the whole class period, were all defrauded by one trial in a single stroke. Can we pick up with your first point about variation in the inflation percentages or rates? So the plaintiffs allege in this case that the misrepresentation is that they were told this was an estimate of people, and actually it was an estimate of accounts. And Meta didn't make that clear. And that's in and of itself the misrepresentation. If that's true, then what I'm struggling with is why does the inflation rate matter? If it's more, the misrepresentation is basically the calculation method. That's what plaintiffs are saying now in this appeal, but that's not what their case was below. Well, that's what they said in their complaint. Right, but actually in their complaint, what they say is that Meta did not sufficiently deduplicate and remove enough fake and duplicate accounts. That's 2 ER 89, their third amended complaint. What they're saying is, and what the judge found, is the problem is the numerical discrepancy between the number that's said to be people and whether it actually was inflated because it really was different than the accounts. Right, but that goes to calculation method, right? Meta was telling me this is an estimate of how many people I'm potentially going to reach. And in Meta creating that number, that metric for me, what they're doing is counting accounts. And those numbers don't congruent. And it's only if they are not congruent by a material delta that it could possibly be material. For example, if Meta said your estimated target audience is about a million and whether they say it's a million people or a million accounts, if those numbers are roughly the same, it doesn't matter which word they use to an advertiser. So that, I mean, that relates to another question that I have. In the record here, what tells me when does that delta become material? Like what's the percentage that makes something? Is there anything in the record that tells me that? That's the heart of the question. What is the materiality? If I give you an estimate and I say, hey, there's about a million people and it's really 990,000, right, is that estimate false? The fake case in any case would say, no, an estimate isn't false because it's off by a few percentage points. For some estimates, it's fine if they're off by 10 or 20 percentage points because it really doesn't matter. For other estimates, if they're off by, well, if you estimate if you're flying to the moon and you need to estimate some precise calculation, a tenth of a percentage off could matter. If you say a potential target audience is about a million, but by the way, with your $20 budget, you're only going to hit about a thousand people per day with your ad, who cares if your total target audience was a million or 950,000 or even 500,000. You might not care because you're spending $20 a day or $15 a day as one of the named plaintiffs did and you're told, hey, your estimated daily results are only going to be about one to three thousand. So for an advertiser like that, they would not really care if this other estimate is off. And by the way, it's not as if these, it's not as if like on a package you get one estimate on the front and you get the other estimate buried, you know, in the back in the pellet brief, you really see an actual snapshot of exactly what Meta displayed. And what you see on page seven is that particular advertiser, because of their targeting, which Meta said with its cute little chart is too broad, that advertiser got a potential reach, theoretical audience of about 4.6 million people. But that advertiser was only spending enough such that its estimated daily results for its particular ad by that, by the information that's presented right there together, is one to three thousand. So for that kind of advertiser, which by the way is the kind of advertisers the two named plaintiffs are, they put in these wildly inflated potential reach targets, but then they only spent a relatively small amount so they really were only trying to target a few thousand people. For that advertiser, it's really hard to see how the inflation of the But that's going to be a jury question. On the other hand, if you had an advertiser, say Pepsi, that that might say, well, gee, if the potential audience is four and a half million, I'd sure like to reach all four and a half million and convince them to drink Pepsi. That advertiser might spend a lot more to reach say five hundred thousand estimated per day. And the plaintiff's base theory is for that kind of advertiser. When you say, when you're told there's four and a half million and you want to spend enough to reach, or you have the money to try to reach five hundred thousand a day, the question is, well, if that ad is off by 50 percent, you might run your five hundred thousand per day ad nine times thinking you can get to an illusory four and a half million when really you should only be running your ad three or four times. You're in a totally different position than an advertiser where there's a big delta between those two numbers, where you just don't really care. And then layered on top of that, some of those estimates, plaintiffs say, are off by 50 percent. Many, or even if not the majority of those potential reach estimates, our expert concluded are off by a de minimis amount, less than 10 percent, just a few percentage points at most. Now, this is a classic battle of the experts over historical facts. And it doesn't go to the merits, it goes to the the amount of variation in the class and the very question of whether you can certify a class. So with our expert putting in a mountain of evidence that says the variation ranges from de minimis to 50, then you have their experts saying, well, no, it actually ranges from 10 to 50. First of all, we'd say that's still too much of a range because a 10 percent inflation might be meaningless to some advertisers, whereas 50 would be meaningful to others. But the district court didn't even try to engage in that battle of experts. The district court said, well, plaintiffs say the range is 10 to 50. Meta admits there's at least some inflation, P.S., some meaning de minimis. And as a result, that's good enough. I'll let it go to the jury. And I don't need to do more at this stage. And if down the road I decide to look at the evidence and I decide to decertify, that's when I'll do it. From this court's cases, whether it's Ellis to the Enbanc decision in Olean, that is just clearly not sufficient. It's the court's responsibility, this is the Olean Enbanc panel, it's the court's responsibility to actually resolve disputes about historical facts if necessary to determine whether plaintiff's evidence is capable of resolving a common issue central to their claims. And the court has to actually weigh conflicting expert testimony. What the district court below did, simply, is they said, well, their experts get past Albert. It's admissible, just like the meta has some other things that they say about it, but that's enough and that's all I have to do at this stage. It's just clearly inadequate, whether you look at Ellis, whether you look at Olean, or any other case, the Supreme Court that says those kinds of facts, not deciding the ultimate merits, because a jury is going to decide the ultimate merits. 10% inflation, if we had to try that case, I think we would be able to prove to a reasonable jury that 10% inflation in an instance is meaningless to most advertisers. On the other hand, if we were to win that, and we were to prove that 10% is meaningless, what does that say about a class member who actually had 50% potential reach inflation? Maybe it wouldn't be so meaningless. The flip side of that is, if the plaintiffs come in with a individual who says, well, my inflation was 50%, that really matters. Okay, but what does that say about those whose inflation was only 10%, let alone those who are less than 10%, as our expert found was the case for 90 plus percent of the time? These issues are not merits issues. That's the point. These issues show what a crazy amount of variation there is in this class. And you literally, when I try to imagine trying the case, and I've tried class actions before, you just, it's hard to imagine going into court and having a jury answer questions about these two named plaintiffs that would tell you anything about 99% of the rest of the class, who all had different inflation, some de minimis, who had different delta between their potential reach and their estimated daily results, who had different actual results that Meta provided. And by the way, Meta only charges advertisers based on actual results. Meta doesn't charge a single penny based on this potential reach estimate, which Meta tells its advertisers is to be used for targeting, not for budget setting. And Meta says that right up front, and it's another set of accompanying disclosures. I mentioned the variation in accompanying disclosures. So we're layering now different alleged inflation, different delta between the potential reach estimate and the estimated daily results, which is what Meta tells advertisers they should actually care about. Then you've got different accompanying disclosures that change pretty substantially over the class period. Early on in the class period, the plaintiffs might say, well, those were insufficient. By at least as early as March of 2021, so two years ago, and the class goes right through the present. So at least as of 2021, Meta was getting into very granular details, reminding advertisers, this includes fake accounts, this includes duplicate accounts. We do our best to dedupe. By the way, Meta deduplicates millions of accounts every year, and they remove billions with a B of fake and bought accounts. So to circle all the way back to your original question, Your Honor, if Meta had said, hey, these are accounts, it would have wildly understated the number of accounts because Meta has deduped millions of accounts and If the district court had done subclasses based on the changing disclosures, would your argument change? It would have helped potentially limit one of those five significant variations that I mentioned that makes this class untenable. But of course, it's the plaintiff's burden to give the district court some methodology for making a class action useful to anyone. So the By the way, there's millions and millions of advertisers, other than the two main plaintiffs and a few who originally were part of the cast, but either got dismissed or dropped out. There are no plaintiffs who have come forward. There's no plaintiffs who have come forward, for example, since March of 2021, who see extremely robust disclosures. And after this case has been well publicized, there's not a single advertiser coming forward and saying, hey, I'm still being defrauded by this potential reach number, which I know exactly what it means. In 2019, there was other disclosures added about warning people that, frankly, what any reasonable advertiser probably knows, which is that, hey, a lot of folks have duplicate accounts. People have a Facebook account. They have an Instagram account. By the way, Meta does enormous work deduplicating those counts. If someone wants to advertise on both Facebook and Instagram, there's a lot of record evidence that says reasonable advertisers all know about that. Nevertheless, back in March of 2019, four years ago, probably almost half or more of the class, they've had a specific disclosure about that. And the plaintiffs don't want to try that case. Their particular plaintiffs bought ads before that disclosure was added, but there's no mechanism for dealing with that. And again, those varying disclosures, it's like a matrix of five different things, and you would have to find any particular plaintiff, let alone these two particular ones, who do have such unique circumstances and unique defenses that are applicable to them. You'd never find in the real world an advertiser whose claims are going to resolve the others. My time is running- So your counsel, I want to get a question in before you sit down. Sure. So in Dr. Tatalos' expert rebuttal report, he references some help center. Is that part of the ad manager? Yes, Your Honor. The way it works is you pull up ads manager, and you immediately see certain information, and then you have clicks that you can click on. We've all seen those websites, right? Where it says, for more information about how this is actually calculated, click here. And so the various- So you have to navigate to a different environment, maybe. For some of the disclosures, some words are right there on the front of the page. Other words, you have to click that it links to. But I'm specifically asking about the ads help center. Is that part of the ad manager environment, and it's just a different page? Or is it totally separate? I'd have to go to a different webpage or something to find that. It's part of the same environment. I'm being told by my phone a friend that it is part of the same environment. So if that's true, should we consider the information that is in that- we're calling it environment- on that page or whatever as part of figuring out what the disclosure was, or what the representation was to ad buyers? I think someone needs to. A jury certainly would. If you think about a labeled product- Well, I'm asking you us. We're trying to figure out what is the alleged misrepresentation, and can that be established on a class basis through common proof? And can materiality be established through common proof? And can reliance be established through common proof? We have to figure out all the answers to those questions. So I'm trying to figure out the information that Facebook presented through the ads help center. Is that part of the calculus that I should be considering and figuring out? Are these common questions or not? I've been given the simple answer, yes. But of course, that's the right answer. Yes, your honor. Any advertiser who's using the site is directed to and it's part of the labeling. I mean, in the real world, you have a label on a product, and there's always a question whether stuff on the front of the can is maybe as important as the stuff in the back of the can. But a court, nevertheless, looks at the total mix of information. In the digital world, whether it's right on the same page or there's a prominent click that says click here, it's effectively the same thing. And by the way, if you had a page that just had tons of fine print and every single thing on that first page, that would be less effective than have a highlighted blue button that says click here to understand this, which is much more prominent. That's the problem in the digital world. It's just, you know, you're sort of and meta, there's evidence in the record that said meta consider this. When you put too much on one page, you know, we've all been there. You see this whole long page of disclosures and you, what do you do? You don't read any of it. You just click at the bottom. Whereas if you find the right ones to be prominent or you have the right prominent clicks, that encourages people to read it. Your Honor, if I may, I'd like to reserve some time. Before you sit down, Judge Wallace, do you have any questions? I do not. Thank you. Okay. Thank you, Your Honor. All right. Mr. Graber. Good morning, Your Honor. Good morning. May it please the Court, Jeffrey Graber on behalf of Plaintiff Appellees from Cohen Millstein. Just before I get into the merits, I would just like to address very quickly one new argument that was raised here this morning for the first time. This morning, counsel said that the District Court somehow abused its discretion in relying on Dr. Cowan. In its opening brief, Facebook never raised that argument, never disputed Dr. Cowan's analysis. So plaintiffs never had an opportunity to address that in their briefs and the Court should not entertain those new arguments now. Let me just begin by highlighting three reasons why the District Court's decision should be affirmed and why it was not an abuse of discretion. First, this case is about a single metric, potential reach, which is always materially false and is shown to every class member. Second, potential reach fits within this Court's common course of conduct standard. And third, because Facebook showed every class member a materially false potential reach, a presumption of reliance arises across the class under California law. Very quickly, before going further, I'd like to address, Judge Forrest, your question about the disclosures here. Those are, Judge Donato correctly found, did not abuse his discretion finding that that is a class-wide merits issue. The disclosures that they are referencing were always the same at any given time in the class period. Well, except for if your, if your theory is that the misrepresentation was we were told people when it was actually accounts and the disclosures give ad buyers information about the, about the calculation, how it was and that there were duplicate accounts or whatever, and those changed over time. How can those not be part of the representation that's at issue? Your Honor, that's the, at any given time, those are the same. And this is exactly No, I get that. I get that in certain periods of time, everybody was told the same thing. But through the entire class period, everybody wasn't told the same thing. This is, this is routine in every securities case. In every securities class action, fraud class action, there are corrective disclosures over time. And the jury can cut off the class period at a certain time if, and if they disagree with the time period proposed by the plaintiffs. But it doesn't bar class treatment. So stepping back, they never disclosed the truth. They never disclosed that they were counting, not counting people, that potential reach is always materially inflated. They never disclosed any of that. But it's a jury question. And it's a jury question that comes up, again, in every securities case. So the fact that there were, that there were dis, evolved, as they put it, evolving disclosures over time presents no problem for class treatment. What's your best case for that? I mean, I'm trying to figure out, like, I used to be a trial judge. I'm trying to put myself in the position of a trial judge. How are you going to, how are you going to handle this where you do have clear periods of time where everyone was told the same thing, but there are multiple of those sort of subperiods within this class period? And how are you going to deal with that as an evidentiary matter? And why wasn't this split out of subclasses? Well — So what is, what is your best authority to tell me that I shouldn't care about that at this point? That's something that the district court or the jury will sort out. There's two cases. We cite them in our brief. Ludlow, which holds that corrective disclosures is a class-wide merits issue, and Sirota, the Second Circuit case, that it would be wrong to decide facts going to the merits when deciding the time limits for a class. This is routine in securities cases, and here, there is no manageability problem. If Facebook will present at trial these various disclosures, we will argue that they are not disclosures at all. But if the jury were to decide that in 2020 or in 2019 that there was sufficient disclosure, that would be the end of the class period. And this comes up in antitrust cases as well, when they're determining the length of the conspiracy. The time period, the appropriate time period, is a class-wide question for the jury. All right. Now, turning to the misrepresentations here, the potential reach misrepresentations here meet this Court's common course of conduct standard under First Alliance. Potential reach is always falsely expressed as people, as Your Honor pointed out, and that is an identical misrepresentation, and it is always materially inflated for every class member due to common sources of inflation. So that's the rub for me, is that point, because you're only going to get the presumption of reliance if you have a common material representation. I think that you can probably get there with a common representation, other than this sort of, what do we do with these periods of the disclosures changing? And I'm still thinking through that. But the materiality point, I mean, many of the cases that we look at, just because of the context and what's at issue, you know, it's sort of, it's a black or white. It's like, you told me X, but it was Y, and so there's no room for gray there. And so materiality just sort of follows, if you can say that this was a misrepresentation. Here, I'm struggling with, we know at the outset that potential reach is an estimate. It's not a black or white figure. It's not a precision figure that's given to potential ad buyers. It's an estimate. And so if that's true, and it is, then how does materiality just automatically follow? Because isn't it true that whether the deviation between what someone was told and what the truth was, whether that was something that was going to be precise? Like, for example, you know, what are the terms of the contract? They're either these terms or they're not these terms, right? It's not an estimate of terms. How do I think about that when this case starts with sort of a soft number? Your Honor, two points regarding the estimate. As this court found in Aloe Vera, estimates can be actionable where the speaker knows it can't be true. And Judge Donato specifically found that. They know, there's know that they're inflated and they know they're not counting people. And secondly, But materiality is judged from the hearer's perspective. What a reasonable person would think matters, right? And so if I'm an ad buyer and what I was told and the truth, the difference of that is, you know, less than 1%, do I care? Versus if that difference is 25%, do I care? Your Honor, that's my second point. And that is that, first of all, potential reach was always materially inflated by a baseline amount. Facebook does not dispute that on appeal here. It is always inflated by 33% at the outset and 10% after targeting. There's no dispute on that here. And Dr. Allenby shows in his conjoint survey that those baseline inflation levels are material. It was sufficient to move the demand, to increase the aggregate demand. And Facebook does not dispute that either. There's another critical piece of materiality evidence here as well. And that is Facebook's own actions. And the courts are clear that a defendant's own actions are powerful evidence of materiality. Facebook knew that potential reach was inflated by at least 10%. Their chief marketing officer admitted that in documents, that it is always inflated by at least 10%. And then at the same time, that same employee, the chief marketing officer, instructed the sales staff not to disclose that, and then blocked efforts to reduce potential reach by 10%, the same baseline level here, because it would have a severe revenue impact. And they admitted that it's revenue they should have never made because it's based on wrong data. I would submit, Your Honor, there is overwhelming evidence here of materiality. Overwhelming. If we set aside Facebook's conduct, you pointed us to Dr. Allenby as support for showing that the deviation levels that have been presented by the experts are material to potential ad buyers. Yes. So it's Allenby and then Facebook's business practices. That's correct. And in addition to the other overwhelming evidence showing the materiality of potential reach, they admit that potential reach is its single most important number on its ads creation interface. They admit that it's vital, these are their own words, to 100% of their revenue. They admit that, in their own words, everyone uses it. Their head of global sales said that if we overstated the number of people in a demographic, then of course it impacted the budgets. There is overwhelming evidence of materiality here. And materiality... But we also have in the record statements from, and I know that you, I think, refer to these as cherry picked or something, potential buyers and maybe even a statement from one of our named plaintiffs saying, I don't really care about this number. I was thinking about other things when I was making my decision about buy ads and how much to spend. Well, they reference... Just to step back, just as an initial matter, materiality is a class-wide merits issue. That is the holding of Amgen. It is a classic issue for the jury. And in fact, I think I heard opposing counsel say that it's an issue for the jury. As for these statements that they reference, they reference statements that were submitted in connection with 10 self-serving declarations that were produced after the close of discovery. So out of millions of advertisers, this is what they gave Judge Donato, 10 hand-picked advertisers who, according to them, told them a week before their opposition to class cert was due that they didn't care about potential reach. But that is not enough to... And it certainly does not create an issue that bars class treatment. As for the reference to Mr. Zernicki's statement, he explained what he meant there. He was interacting with people online who were confronting him when he said that potential reach is always inflated. But that goes to the credibility of Mr. Zernicki, which is soundly within the discretion of the court, excuse me, the district court. And he lowered his ad spending by over 90 percent after he learned the truth. So I would — I would submit, Your Honor, there is just — there is overwhelming evidence of materiality here. This is — this is not a typical case where we have one or two stray e-mails from inside the company. They spent years blocking efforts to try to fix this problem. Their head of — of potential reach declared internally, we are misleading advertisers. These are his own words. He said this is a lawsuit waiting to happen. Materiality is always a question for the jury. It is — it is a class-wide issue. And here, there is overwhelming evidence. It was not an abuse of discretion to find that there was class-wide evidence of materiality here. I think — I mean, I understand the argument. I don't think it's a bad one. But what — what you're pushing against is a little bit of a common-sense principle, I think, because I think if materiality has to do with how inaccurate is this information that I was given as a potential ad buyer, the Fortune 500 company is going to have a different tolerance for inaccuracy than the mom-and-pop shop. But, Your Honor, the question is whether a reasonable person would find it to be — to be material. The argument that the raising — But it has to be a reasonable ad buyer, not just someone — — random person off the street. And this class includes every level of ad buyer. That argument — that line of argument was raised in Occidental Land, and the California Supreme Court squarely rejected it. There, the defendant argued that the financial position of the various class members had to be taken into account to determine materiality. Justice Mosk said that we rejected that — that notion. We rejected that framework in Vasquez. It's an objective, reasonable person standard. And here there is overwhelming evidence of materiality. What they are arguing for is really — this is — it would be a sea change in the law. That is what they are arguing for, that somehow materiality is — is not an objective inquiry, and it somehow changes, you know, based on the hypothetical preferences of various class members. I will also note that there is, in addition to the — the other evidence of materiality that we have here, Dr. Allenby's conjoint shows that — that regardless of the ad buy — the ad budget and the size of the potential reach, that did not impact the materiality. So there is econometric — undisputed econometric evidence showing that — that these misstatements and the baseline inflation levels are material regardless of the size of the — of the ad budget or the — or the potential reach. If I could turn quickly to — to the reliance point. Because Facebook made material misrepresentations to all class members, the district court did not abuse its discretion in applying California's presumption of reliance. Facebook argues a presumption of reliance requires similar representations be made to the class. Here, as Your Honor pointed out, potential reach is always falsely expressed as people. That's an identical misrepresentation. And potential reach is always materially inflated by a baseline amount of 33 percent at the outset and 10 percent after targeting. As Judge Donato found, you know, Dr. Cowen shows that potential reach is always significantly inflated. For everyone with a potential reach above 1,000, that's — that's where the class definition cuts off. So everyone receives a materially inflated potential reach. Under California law, presumption of reliance arises whenever a material misrepresentation is made. Materiality is an objective inquiry capable of class-wide proof based on a reasonable person's standard. And if a reasonable person would have relied on the misrepresentations, a presumption of reliance arises as to each class member. Now, below, Facebook argued no presumption should apply because potential reach is not material to advertisers, and it had rebutted the presumption. But as we just discussed, given the substantial evidence of materiality, the district court correctly rejected those arguments, and that was not an abuse of discretion. And now — I hesitate to — I hesitate to interview — interfere with that very fine argument. I have a question about potential reach. I'd like to have you take care of it while you're still on that issue, if you wouldn't mind. Yes, Your Honor, please. Variation in potential reach estimates affect this court, our court's predominance analysis under Rule 23. I'm sorry, I wasn't able to hear Your Honor's question. I'm sorry. You couldn't hear? Yeah. Could you repeat that, Judge Wallace? I'm sorry. I couldn't hear you. Oh. Well, our machinery isn't working, so I'll withdraw my question. No, I think — I think it's just breaking up a little bit, Judge Wallace, and why don't you restate it? It's a matter of curiosity when you were — when you were talking about potential reach and what we have been doing under Rule 23B3, and I just wanted to get your take on that. But that's fine. Let's withdraw the question and get on with the argument. Okay. Now, Facebook now argues no presumption of reliance can apply because it has a right to rebut every individual class member's subjective reliance. That is wrong as a matter of law. As I noted earlier, I was mentioning Vasquez and Occidental Lamb, but that argument was where the defendant argued that it had the right to take the testimony of every absent class member to determine their subjective views. The California Supreme Court squarely rejected that. And in Blackie, this court found that the right to rebut the presumption of reliance does not bar predominance. And Olien underscores this in discussing Halliburton, explains that once a plaintiff shows common evidence can establish a presumption of reliance, the defendant's ability to rebut the presumption as to some plaintiffs does not raise individualized questions sufficient to defeat predominance. And as I noted here, there's overwhelming evidence of materiality here. Let me just touch briefly on Facebook's argument regarding the, sorry, the argument regarding injury and price premium. As we noted, this was a new argument that Facebook did not raise. There's no basis for that argument. And in any event, Facebook's notion that we had to show market efficiency like you would have in a securities market, even if that were required, plaintiffs show that here because a plaintiff's own expert, Dr. Roughgarden, shows that the market is efficient. Facebook's own expert agrees with that, and moreover, this was never before the District Court. I'll simply note in closing, Your Honor, there was overwhelming evidence to support the District Court's decision. Facebook will have an opportunity to make, if the Court affirms certification here, they will have an opportunity to make these arguments. They've made many of these arguments in their motion for summary judgment, and they'll have an opportunity to make these arguments at trial. Thank you. I have one last question just to clean up issue on the standing with regard to the injunctive relief issue. Yes. Are you still advancing the DZ Reserve has standing? Your Honor, I think it's fair to say that Mr. Maxwell's testimony is stronger than DZ Reserve's, but yes, the substance of his testimony is that there was only two games in town, Google and Facebook, and he would like to be able to run ads on Facebook. Plaintiffs only need one. I understand that. Yeah. Is DZ Reserve operating now? Yes. It's still an active corporation. I'm sorry? I was unable to discern what his business was. Well, it's a... You said e-commerce in your complaint. It's like a wholesaler or a middleman where they buy product from the manufacturer or from one party and then sell it online. That's an argument that was plucked from a later filed motion for summary judgment that is still pending before the district court. Their argument regarding injunctive relief was not raised before Judge Donato, but it is currently pending before Judge Donato in a separately filed motion for summary judgment. And respectfully, we think that that's the best course of actions to allow Judge Donato to make these factual findings and evaluate the factual arguments that they raise here in the motion where they chose to make it, which is their summary judgment motion, again, which is still pending. Did I answer Your Honor's question? Judge Wallace, do you have any further questions? No. No. Okay. Thank you, Counsel. Thank you. All right. We'll give you three minutes because I took you a little bit over with questions. Thank you, Your Honor. Three. I have four points. Not three. Not four minutes. Four points. Okay. But first, very quickly, 3ER295, DZ Reserve, Mr. Zerdiki was asked, is DZ Reserve still in business? Answer, there's no business activity, but the corporate entity is still active. They haven't conducted business. They've just left the corporate entity open. By the way, they were a drop shipper, which means they would advertise something that was maybe made in Singapore, like a pimple popper was one of their ads, and they would buy the product directly. They had no employees. They had no manufacturing. They didn't have a warehouse where they held the inventory. They were just a drop shipper. They spent about $1 million in ads and made about $1.9 million before they were kicked off the platform. And then Mr. Zerdiki said, well, then I never advertised again. We found out that he had set up these shell companies with a fake name to continue trying to advertise on Facebook. A whole host of individual issues that you'd have the whole trial just about that. Mr. Maxwell was asked, his business also was dissolved, he said. And he was asked, what do you mean by dissolve? He said, Max Marcialis, that was the business, is no longer active. I haven't been proactive in unmaking the company. I just ran out of inventory and stopped running it. So that's 2 ER 46, okay? They don't come close to meeting the injunctive relief standard to show concrete plans to actually advertise again. And besides, their claims would fall under TransUnion because all they wanted was informational. But to the four points that I want to make quickly, number one, Meta put in a mountain of evidence showing that the inflation ranges from de minimis, i.e. a couple percentage points at most and above. And, in fact, Meta put in evidence, and it's at 4 ER 469, and asked the trial court for a hearing on this evidence where our experts showed that it was a 90-plus percent certainty that most of the class members had less than 10%. Their experts said it was a 99% certainty that most had more than 10%. That's not a merits issue. That goes to what's the range of alleged inflation. That's exactly the kind of thing the judge should have decided, and counsel got up by saying, well, gee, I made a new argument by saying he shouldn't have relied upon Dr. Cowen. Judge Donato didn't really rely on anyone. He just quoted the experts of the plaintiffs. He didn't really quote our expert. He certainly didn't engage in a battle of experts, didn't even allow a hearing, let alone an evidentiary hearing. Number two, it's not a small number of class members who didn't rely. In a stock drop case, I've tried stock drop cases to a jury and beyond, and you get a chance to rebut the presumption, but there's always going to be a very small number of class members who possibly didn't rely on the market when they bought their stock. Very unique circumstances. Whereas, in their case, 21% by their own expert did not rely. Thank you, Your Honors. I thank counsel for your helpful arguments in this interesting and important case. It is under advisement, and we are adjourned for the day. All rise.
judges: WALLACE, THOMAS, FORREST